**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF VIRGINIA**
**ROANOKE DIVISION**

| | |
|---|---|
| **NAUTILUS INSURANCE COMPANY,** )<br>**as subrogee of ELECTRO FINISHING,** )<br>**INC.,** )<br> )<br>**Plaintiff,** )<br> )<br>**v.** )<br> )<br>**APPALACHIAN POWER COMPANY,** )<br> )<br>**Defendant.** )<br> ) | **Civil Action No.: 7:19-cv-380** |

**BRIEF IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OR,**
**ALTERNATIVELY, TO DISMISS PLAINTIFF'S CLAIMS AS A SANCTION FOR**
<u>**SPOLIATION OF EVIDENCE**</u>

<u>BACKGROUND</u>

In this subrogation case the plaintiff, Nautilus Insurance Company ("Nautilus"), has sued

Appalachian Power Company d/b/a/ American Electric Power ("Appalachian") claiming that

Appalachian's electrical conductor somehow caused a fire which occurred on June 3, 2018, and

which damaged a building in Wythe County owned by plaintiff's insured. The Complaint alleges

negligence and breach of contract. However, Nautilus has no admissible evidence to support

either cause of action.

In connection with the negligence claim, Nautilus has not disclosed any expert witness

who will opine that Appalachian violated any applicable provision of the National Electrical

Safety Code, the recognized industry standard which the Supreme Court of Virginia has held to

govern the construction, installation and maintenance of overhead electrical conductors.

Similarly, Nautilus has not identified any fact witness who is claimed to have seen

Appalachian's electrical conductor in contact with the roof of the building at any time before the

*{2670863-1, 102967-00120-01}*

fire occurred, or who claims to have reported any unusual or unsafe condition to Appalachian at any time prior to the fire. Nautilus also has failed to identify any provision of any contract or agreement that would support its breach of contract claim.

Nautilus, instead, bases its entire case on the expert opinion of its fire cause and origin expert, John Moore. Appalachian has moved to exclude any testimony from Mr. Moore under Federal Rule of Evidence 702[1] and it incorporates its brief in support of that motion by reference.[2] Absent Mr. Moore's testimony, Nautilus cannot prove either negligence or proximate causation.

Finally, as detailed in Appalachian's brief in support of its motion to exclude Mr. Moore, Nautilus allowed the building to be razed before putting Appalachian on notice of the claim, and Appalachian's cause and origin expert was therefore unable to conduct an independent examination. Combined with the failure of its expert, Mr. Moore, to preserve any evidence or to provide any adequate documentation of his investigation, this spoliation of evidence provides an independent basis for dismissal of all of Nautilus' claims. At a minimum, this spoliation should preclude any effort by Nautilus to invoke the doctrine of *res ipsa loquitor* to attempt to salvage its claim.

<u>ARGUMENT</u>

## I.     NAUTILUS HAS FAILED TO COME FORWARD WITH ANY ADMISSIBLE EVIDENCE TO SUPPORT ITS CLAIMS.

---

[1] ECF Nos. 35 & 36.

[2] The facts set forth in Appalachian's brief in support of its motion to exclude Mr. Moore's testimony (ECF No. 36) are undisputed with one exception: Mr. Moore has claimed he told the building owner, Mr. Litz, that he needed to preserve the fire scene until Nautilus instructed him that he could demolish the building. Deposition of John Moore, October 7, 2020 at p. 49 (hereinafter "Moore Dep. at ___"), previously filed as ECF 36-1. Mr. Litz claims that no one ever told him that he needed to preserve the fire scene or preserve any evidence. Deposition of Timothy Litz, September 29, 2020 at pp. 27-30 (hereinafter "Litz Dep. at ___"), previously filed as ECF 36-3. Appalachian submits that this factual dispute is not material for purposes of its summary judgment motion.

Woods Rogers PLC
ATTORNEYS AT LAW

**A.**   **Absent Mr. Moore's Testimony, Nautilus Has No Evidence From Which a Jury Could Find Appalachian Breached Any Duty, or That Any Act or Omission by Appalachian Was a <u>Proximate Cause of the Claimed Damages</u>.**

Under controlling Virginia law,

> In order to recover, the plaintiff must do more than merely prove he has suffered a loss. He must prove a wrong, the cause thereof, and trace it to the defendant. The burden of this proof rests upon the plaintiff. It is incumbent upon him to show how and why the fire occurred, – some fact or facts by which the cause can be determined by the jury, and not left entirely to conjecture, guess or random judgment. He is required to prove by a preponderance of the evidence that the fire was caused by some agency for which the defendant was responsible. It is not sufficient that the evidence show a possibility, or even a mere probability, that the fire was caused in the manner charged. It must be based upon facts proved, or regarded as proved.

*Barnett v. Virginia Pub. Serv. Co.*, 169 Va. 329, 341–42 (1937).

Here, if Mr. Moore's opinions are deemed inadmissible, then Nautilus has no evidence whatsoever of any breach of duty by Appalachian. Nautilus has not designated any expert witness who will testify that Appalachian violated any applicable Code or that it was guilty of any negligent act or omission. Mr. Moore offers no opinion that there was any defect or deficiency in Appalachian's facilities or equipment (and he would not be qualified to do so in any event.) No fact witness reported seeing Appalachian's electrical conductor in contact with the metal roof of the building prior to the fire, and no one reported any electrical issue to Appalachian prior to the fire. The entire claim therefore rests on Mr. Moore's unsupported (and inadmissible) opinion that Appalachian's electrical conductor somehow sagged and was in contact with the metal roof of the building for some unknown period of time, creating an electrical fault that caused the fire. Absent that testimony, there is no evidence from which a jury could conceivably find any breach of duty by Appalachian.

Nautilus likewise has no evidence of proximate causation aside from Mr. Moore's unsupported opinions. Because Mr. Moore's opinions as to the cause of the fire are inadmissible, Nautilus simply cannot make out a *prima facie* case of negligence. *Blue Ridge Service Corp. v. Saxon Shoes, Inc.*, 271 Va. 206, 218 (2006) (because testimony of plaintiff's fire cause and origin expert was speculative and inadmissible, and plaintiff had no other evidence as to the cause of the fire, case should not have been submitted to the jury).

        **B.**      <u>**Nautilus Has No Evidence to Support its Negligence Claim.**</u>

                **1.**      **Nautilus Has No Evidence of Any Defect or Deficiency in Appalachian's Facilities or Equipment, or That Appalachian Had Notice of Any Potentially Hazardous Condition.**

As the Supreme Court of Virginia has recognized, the height and location of Appalachian's electrical conductors, and the design and installation of its facilities, is determined by the applicable provisions of the National Electrical Safety Code  *E.g.*, *Virginia Elec. & Power Co. v. McCleese*, 206 Va. 127, 131 (1965); *see Kelly v. Virginia Elec. & Power Co.*, 238 Va. 32, 36 (1989). Here, Nautilus failed to disclose any expert witness who is prepared to testify that Appalachian violated the National Electrical Safety Code, or that it violated any legal standard or duty or was negligent in any way with regard to the construction, maintenance or inspection of its electrical facilities and equipment.

Even if the Court were to permit Mr. Moore to testify, he specifically stated in his deposition that he did not believe that there was any failure in Appalachian's facilities or equipment  and he would not – or could not – opine that there was any defect or deficiency in Appalachian's facilities or equipment.[3]

W<span>OODS</span> R<span>OGERS</span> PLC
ATTORNEYS AT LAW

---

[3] Moore Dep. at 37-38.

Absent expert evidence of such a violation, Nautilus would need to show that Appalachian had actual or constructive knowledge that its conductor was sagging against the roof of the building as alleged. *Andrews v. Appalachian Elec. Power Co.*, 192 Va. 150, 156 (1951) ("Where the defect or dangerous condition causing the injury does not arise from the negligence of the power company its liability turns on whether it knew, or by the exercise of reasonable diligence should have known, of the situation in time to have avoided the injury."); *Trimyer v. Norfolk Tallow Co.,* 192 Va. 776, 785 (1951) (explaining that "the dividing line between liability and non-liability" is "the existence or non-existence of facts and circumstances which show actual or imputable knowledge of the danger" on the part of the utility). Here, Nautilus has not identified any fact witness who claims to have seen Appalachian's electrical conductor sagging against the metal roof, or who claims to have reported any unusual or hazardous condition to Appalachian at any time prior to the fire. Mr. Moore testified not only that he had no idea how long the electrical conductor was supposedly in contact with the roof of the building prior to the fire, but that *no one knows* how long it was supposedly sagging against the roof.[4] Nautilus, accordingly, has no evidence from which a jury could conclude that Appalachian was negligent.

## 2.     The Doctrine of *Res Ipsa Loquitur* Should Not Apply.

The doctrine of *res ipsa loquitur* should not apply in this case to save plaintiff's claim. Appalachian recognizes that the doctrine of *res ipsa loquitur* has been applied against electrical utility companies on the theory that "proof that an injury has resulted from contact with a highly-charged wire which is under the exclusive operation and control of the [utility] and is out of its proper place, raises a *prima facie* presumption that the [utility] was negligent." *Andrews*, 192 Va.

WOODS ROGERS PLC
ATTORNEYS AT LAW

---

[4] Moore Dep. at 38.

at 155. However, in all of the cases applying this doctrine there was *fact witness testimony* that the electrical conductor had sagged or fallen on or near the ground for some period of time prior to the injury. *Andrews*, 192 Va. at 158; *Appalachian Power Co. v. Hale*, 133 Va. 416, 419–20 (1922*); Norfolk Ry. & Light Co. v. Spratley*, 103 Va. 379, 380–81 (1905). None invoked the doctrine based solely on the basis of an expert's opinion that the electrical conductor caused the injury.

Additionally, all of those cases involved injury from high-voltage overhead distribution lines with regard to which the electrical utility owes a high degree of care. *Appalachian Power Co. v. Hale*, 133 Va. at 424. The doctrine should not apply here where the case involves a low-voltage electrical service drop.[5] *See Brashear v. Puget Sound Power & Light Co.*, 100 Wash.2d 204, 211, 667 P.2d 78, 81–82 (Wash. 1983) ("Our prior cases have restricted the highest degree of care standard to high voltage cases for good reason. In high voltage cases, the risk of death is so great that the utilities are obligated to exercise the utmost care. Requiring an equally high standard in low voltage cases simply is not justified by the nature of the risk."); *Eastern Shore Public Service Co. v. Corbett*, 227 Md. 411, 427, 177 A.2d 701, 708–09 (Md. Ct. App. 1962) ("We hold that the trial court's instructions to the jury in this case, involving low voltages which are not ordinarily nor inherently perilous to life or grave bodily hurt, that the defendant owed to the plaintiff the duty 'of exercising the highest degree of care' and 'the very highest degree of care practicable under all the circumstances' to prevent his injury constituted prejudicial error"), *adhered to*, 180 A.2d 681 (Md. Ct. App.1962).

The doctrine of *res ipsa loquitur* also should not apply in this case where there is an obvious alternative reason why Appalachian's conductor could have ended up on the metal roof

---

[5] Nautilus has come forward with no evidence suggesting that insulated low-voltage conductors delivering electricity to customers pose the same or similar hazards as high-voltage overhead distribution lines.

of the building – the heat from the fire itself. *See Easterling v. Walt*on, 208 Va. 214, 216–17 (1967) (explaining that *res ipsa loquitur* applies "where the means or instrumentality which caused an injury is in the exclusive possession and control of the person charged with the negligence, and such person has, or should have had, exclusive knowledge of the way this instrumentality was used, *and the injury would not ordinarily have occurred if those who have the management and control had used proper care*") (emphasis added); *Pepsi-Cola Bottling Co. v. Yeatts*, 207 Va. 534, 538 (1966) (doctrine of *res ipsa loquitur* "does not apply in the case of an unexplained accident which may have been attributable to one of several causes, for some of which the defendant is not responsible").

Finally, for the reasons set forth below, even if the Court declines to dismiss this action based on the plaintiff's spoliation of evidence, it should at a minimum preclude the plaintiff from invoking the doctrine of *res ipsa loquitur* because the spoliation has deprived Appalachian of the ability to prove an alternative cause for the fire.

### C. Nautilus Has No Evidence to Support Any Claim for Breach of Contract.

Plaintiff's Complaint includes a claim for breach of contract (Count II). That Count claims that:

> Upon information and belief, Plaintiff's subrogor entered into a contract, agreement or document of similar nature (hereinafter "Agreement") with Defendants, for the provision of electric power and services at the Premises.[6]

Nautilus has not identified any contract directly between its insured and Appalachian. Rather, the Tariff approved by the Virginia State Corporation Commission is the contract between Appalachian and its customers. *Kroger Co. v. Appalachian Power Co.*, 244 Va. 560, 562 (1992).

WOODS ROGERS PLC
ATTORNEYS AT LAW

---

[6] Complaint, ¶ 30.

Nautilus has not come forward with any evidence that Appalachian violated any provision of the Tariff, or that any provision of the Tariff which defines Appalachian's obligations has any relevance to the issues in this case.

## II.   ALTERNATIVELY, THE COURT SHOULD DISMISS THIS ACTION AS A SANCTION FOR NAUTILUS' INTENTIONAL SPOLIATION OF EVIDENCE.

The Court's inherent power to control the judicial process includes the power to dismiss for spoliation of evidence. *Silvestri v. General Motors Corp.*, 271 F.3d 583, 590 (4th Cir. 2001), (*citing Chambers v. NASCO, Inc.*, 501 U.S. 32, 45-46 (1991)). In considering sanctions for spoliation the Court must consider: (1) whether the party with control over the evidence had an obligation to preserve it when the evidence was destroyed; (2) whether the destruction was accompanied by a "culpable state of mind;" and (3) whether the evidence destroyed was relevant to the defense to the extent that a reasonable factfinder would conclude that the evidence would have supported the defense. *Thompson v. United States*, 219 F.R.D. 93, 101 (D.Md. 2003). The Court has discretion in determining what sanction is appropriate "both for the purpose of leveling the evidentiary playing field and for the purpose of sanctioning the improper conduct." *Silvestri*, 271 F.3d at 590 (quoting *Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148, 156 (4th Cir.1995)).

In a similar case involving the destruction of evidence from a fire scene, another Court in the Fourth Circuit has explained that:

> The *Silvestri* Court stated that dismissal is warranted if either the spoliator's conduct was sufficiently egregious to amount to a forfeiture of the claim, or "the prejudice to the defendant is extraordinary, denying it the ability to adequately defend its case." 271 F.3d at 593; *Erie Ins. Exch. v. Davenport Insulation, Inc.*, 659 F.Supp.2d 701, 707 (D.Md.2009). The first prong requires the court to find some degree of fault on behalf of the spoliator. *Erie*, 659 F.Supp.2d at 703. Under the second prong, a defendant is prejudiced if as a result of the plaintiff's actions the defendant is

WOODS ROGERS PLC
ATTORNEYS AT LAW

forced to rely on the observations and conclusions of the plaintiff's
experts. *Id.*

*State Farm Fire & Cas. Co. v. P.E.P.C.O.*, 2010 WL 4054315, at *2 (D. Md. Oct. 15, 2010).

As detailed in Appalachian's brief in support of its motion to exclude Mr. Moore's

testimony[7], Mr. Moore says that after he completed his inspection of the fire scene on June 8,

2018, he had a conversation with Mr. Barry Vice of Nautilus and that he told Mr. Vice that

evidence at the fire scene needed to be preserved so that Appalachian could conduct an

inspection.[8] Mr. Moore did not personally contact anyone from Appalachian, insisting that it was

not his responsibility to do so.[9]

Mr. Moore's written report states that, "Per the instructions of Mr. Barry Vice and

pursuant to the findings of the scene examination, no evidence was retained during this

investigation."[10] Mr. Moore suggested that he believed that Nautilus would arrange a joint scene

inspection at a later date.[11] Instead, in July 2018 – one month after Mr. Moore completed his

inspection – Mr. Vice instructed Mr. Moore to close his file.[12]

Around this same time, Nautilus told the building owner that he could go ahead and

demolish the building.[13] His recollection is that this was done around August of 2018.[14]

(Notably, the building owner testified that Mr. Moore did not instruct him to preserve any

evidence and that no one from Nautilus asked him to preserve any evidence.[15]) Nautilus then

waited until the end of October 2018 to send a letter to Appalachian placing it on notice of a

---

[7] ECF No. 36.
[8] Moore Dep. at 59.
[9] Moore Dep. at 59-60.
[10] "Fire Origin & Cause Report" dated February 11, 2020, p. 5 (hereinafter "Moore Report at ___"), previously filed
as ECN No. 36-2.
[11] Moore Dep. at 59.
[12] Moore Dep. at 92-93.
[13] Litz Dep. at 23-30.
[14] *Id.* Mr. Moore echoed that when he went to the scene with Mr. Daugherty in December 2018 it was clear to him
that the building had been razed "some significant time prior to December." Moore Dep. at 61-62.
[15] Litz Dep. at 27-30.

WOODS ROGERS PLC
ATTORNEYS AT LAW

potential claim.[16] By the time Appalachian's expert, Neil Daugherty, went to the fire scene on December 19, 2018, the building had been razed so that Mr. Daugherty could not conduct his own cause and origin investigation.[17]

Mr. Moore understood the importance of preserving the physical evidence. He claims he told Nautilus that the fire scene needed to be preserved so that there could be a joint inspection.[18] He claims he told the building owner to "leave everything as is. Don't touch anything. Don't go in until [sic] heard back from Mr. Vice, his insurance company."[19] He claims that the reason he did not collect any evidence at the scene (even as a sample for testing) was that he was awaiting the joint examination with Appalachian's expert.[20] Nautilus plainly knew on June 8, 2018 – when Mr. Moore spoke to Mr. Vice by telephone immediately after completing his inspection – that it had a duty to preserve all potentially relevant physical evidence if it was going to pursue subrogation against Appalachian. *Silvestri*, 271 F.3d at 591 ("The duty to preserve material evidence arises not only during litigation but also extends to that period before the litigation when a party reasonably should know that the evidence may be relevant to anticipated litigation."). According to Mr. Moore, Mr. Vice specifically instructed him not to collect any physical evidence. Yet one month later, in July 2018, Mr. Vice instructed Mr. Moore to close his file, and Nautilus then instructed Mr. Litz to proceed with demolition of the structure, which was done in August 2018. No one made any effort to contact Appalachian or to put it on notice of a potential claim until approximately two months later. Nautilus not only failed to preserve crucial evidence, but according to the building owner Nautilus ***affirmatively authorized*** the destruction

WOODS ROGERS PLC
ATTORNEYS AT LAW

---

[16] Exhibit 6 to Appalachian's brief in support of its motion to exclude Mr. Moore's testimony (ECF No. 36-6.)
[17] Moore Report at p. 3; Moore Dep. at 54.
[18] Moore Dep. at 54.
[19] Moore Dep. at 49.
[20] Moore Dep. at 68-69.

of that evidence before making any effort at all to contact Appalachian. Nautilus bears full responsibility for the razing of the fire scene and the loss of the evidence.

Appalachian's expert, Mr. Daugherty, stated that the fact that the building had been razed left him with insufficient information to form a scientifically valid opinion as to the cause of the fire.[21] His report details his inability to conduct an appropriate inspection and the reasons why he could not make a cause determination.[22] Appalachian lost the opportunity to examine the fire scene, including the equipment in the building, as it existed immediately after the fire, as well as the ability to conduct testing of items involved – or potentially involved – in causing the fire. It lost the ability to inspect (and potentially to test) the electrical sub-panel to determine the nature of the damage and whether the damage caused the fire or was in fact caused *by* the fire. It also lost the ability to test the remains of the electrical conductor to determine – conclusively – that the damage to it was melting from heat rather than damage from arcing as asserted by Mr. Moore (with no documentation whatsoever). According to Mr. Daugherty, Mr. Moore's photographs and the documentation of his investigation are wholly inadequate and cannot substitute for physical examination and testing. In short, Appalachian lost the opportunity to physically examine and inspect the evidence that is the linchpin of  Nautilus' case, an inspection that Mr. Daugherty believes likely would have shown that Mr. Moore's theory is not consistent with the physical evidence.[23]

Appalachian "do[es] not need to show both a culpable state of mind and prejudice." *State Farm Fire & Cas. Co. v. P.E.P.C.O.*, 2010 WL 4054315, at *3 (citing *Silvestri*, 271 F.3d at 593). Rather, for the Court to impose dismissal as a sanction it "must conclude either that the

---

[21] **Exhibit 1**, Supplemental Report of Neil P. Daugherty dated March 12, 2020, at p.2 (hereinafter "Daugherty Report at ___").
[22] Daugherty Report at 4, 10-12.
[23] Daugherty Report at 12-13.

spoliator's conduct was so egregious as to amount to a forfeiture of the claim, or that the effect of the spoliator's conduct was so prejudicial that it substantially denied [Appalachian] the ability to defend the claim." *State Farm Fire & Cas. Co. v. P.E.P.C.O.*, 2010 WL 4054315, at *3.

Here, the evidence shows that Nautilus acted with full knowledge that it was permitting potentially relevant evidence to be destroyed, and it did so prior to giving any notice to Appalachian and with the knowledge that Appalachian would need to inspect the fire scene and have access to the evidence. Nautilus was not entitled to ignore the fact that Appalachian might entertain a different theory than Mr. Moore, and might focus on different evidence. Instructing the building owner to go ahead and demolish the building under these circumstances evidences a culpable state of mind and smacks of a deliberate attempt to prevent Appalachian from gathering evidence to support a different causation theory or to conclusively disprove Mr. Moore's theory.

"[A] defendant is prejudiced if as a result of the plaintiff's actions the defendant is forced to rely on the observations and conclusions of the plaintiff's experts." *State Farm Fire & Cas. Co. v. P.E.P.C.O.*, WL 4054315, at *2; see *Silvestri*, 271 F.3d at 594 ("[R]equir[ing] General Motors to rely on the evidence collected by Silvestri's experts in lieu of what it could have collected would result in irreparable prejudice"). This is particularly true here, since Mr. Moore himself did not collect samples, preserve any evidence, or conduct any testing – even though he recognized the need to do so – because he anticipated a joint inspection with Appalachian's expert. The investigative record he developed is wholly inadequate to permit Appalachian's expert to disprove Mr. Moore's theories or to formulate his own opinion as to the cause of the fire.

Here, the sanction of dismissal is fully warranted, as there is no other way for the Court to level the playing field. An adverse inference instruction, for example, would be inadequate

because it would still leave Appalachian in the position of having to rely on an investigative record developed by plaintiff's expert, which is inadequate to permit Appalachian to advance any alternative theory of what caused the fire. *Erie Ins. Exch. v. Davenport Insulation, Inc.*, 659 F. Supp. 2d 701, 708 (D. Md. 2009).[24]

## CONCLUSION

For all of the foregoing reasons, the Court should grant summary judgment to Appalachian or, alternatively, it should dismiss all of plaintiff's claims with prejudice as a sanction for Nautilus' intentional spoliation of evidence.

Respectfully submitted,

APPALACHIAN POWER COMPANY

**/s/ Mark D. Loftis**

By_____

Of Counsel

Mark D. Loftis (VSB No. 30285)
WOODS ROGERS PLC
P.O. Box 14125
10 South Jefferson Street, Suite 1400
Roanoke, Virginia 24038-4125
Telephone: (540) 983-7600
Facsimile: Main (540) 983-7711 Direct (540) 322-3749
loftis@woodsrogers.com

*Counsel for Defendant*

---

[24] At a minimum, the Court should preclude Nautilus from attempting to rely on the doctrine of *res ipsa loquitur* – if the Court believes that doctrine could conceivably be applicable on the facts of this case – in an effort to get past the lack of any factual evidence suggesting negligence. Under Virginia law: "When the plaintiff has introduced sufficient evidence to require the application of the doctrine of *res ipsa loquitur,* then to escape liability the defendant must present evidence to prove that the accident was not caused by its negligence." *Virginia Transit Co. v. Durham*, 190 Va. 979, 987 (1950). It would be wholly unfair to permit Nautilus to appeal to the doctrine of *res ipsa loquitur* to save its case when it knowingly and intentionally deprived Appalachian of the evidence necessary in order to carry its burden and escape liability. Appalachian submits that this would likewise result in summary judgment in its favor.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 21st day of October, 2020, a copy of the foregoing was filed electronically with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

**/s/ Mark D. Loftis**

_____